# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

RAY HARVICK,

    Plaintiff,

v.                                          Case No: 6:14-cv-937-Orl-40GJK

OAK HAMMOCK PRESERVE COMMUNITY OWNERS ASSOCIATION INC., BARRY RUBIN, and KAREN VARASDI,

    Defendants.

## **ORDER**

This cause comes before the Court without oral argument on the following:

1. Plaintiff, Ray Harvick's Motion for Summary Judgment (Doc. 44), filed August 4, 2015;

2. Defendants' Response to Plaintiff's Motion for Summary Judgment (Doc. 46), filed August 19, 2015;

3. Plaintiff, Ray Harvick's Reply Brief in Support of Plaintiff's Motion for Summary Judgment (Doc. 53), filed September 4, 2015;

4. Defendants' Motion for Final Summary Judgment (Doc. 48), filed August 24, 2015;

5. Plaintiff, Ray Harvick's Response to Defendants' Motion for Summary Judgment (Doc. 52), filed September 1, 2015; and

6. Defendants' Reply in Support of Defendants' Motion for Final Summary Judgment (Doc. 54), filed September 15, 2015.

Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and memoranda of the respective parties, the Court grants summary judgment in favor of Defendants.

**I.     BACKGROUND**

This Fair Housing Act case arises out of the allegedly discriminatory conduct of Defendant, Oak Hammock Preserve Community Owners Association, Inc. ("Oak Hammock"), against *pro se* Plaintiff, Ray Harvick ("Harvick"), and his family. During the relevant time period, Defendants, Barry Rubin ("Rubin") and Karen Varasdi ("Varasdi"), served on Oak Hammock's board of directors. (Doc. 48-6, ¶ 4; Doc. 48-7, ¶ 4). From February 2005 to July 2014, Harvick owned a home that was governed by Oak Hammock's covenants, conditions, and restrictions. (Docs. 48-1, 48-2). Harvick lived in the home with his wife, daughter, and mother-in-law, all of whom are of Asian descent.[1] (Doc. 48-3, 16:23–17:2, 47:7–12, 51:9–14).

According to Harvick, he and his wife have had a number of disputes with Oak Hammock over covenant violations relating to yard maintenance issues, and that Rubin and Varasdi aided Oak Hammock in its preparation and prosecution of a lawsuit to collect fees the Harvicks allegedly owed to Oak Hammock due to these covenant violations. (Doc. 33, pp. 7–8). Harvick maintains that these legal actions were fabricated and motivated by Defendants' animus toward Asian Americans, and that this animus caused Harvick and his family to move from their home. (*Id.* at pp. 11–13). As a result, Harvick initiated this lawsuit to vindicate rights protected by the federal Fair Housing Act ("FHA"),

---

[1]   The Court notes that Harvick identifies himself as Caucasian. (Doc. 48-3, 47:3–8).

2

42 U.S.C. §§ 3601–3619, and the Florida Fair Housing Act ("FFHA"), Fla. Stat. §§ 760.20–.37. Now before the Court are the parties' cross motions for summary judgment.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials," but may also consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006), *cert. denied*, 549 U.S. 996 (2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

### III.   DISCUSSION

#### A.   Admissibility of Statistical Evidence

As a preliminary matter, the Court must resolve Defendants' objections to the admissibility of certain statistical evidence Harvick proposes to use on summary judgment. (Doc. 46, p. 4). Specifically, Harvick intends to submit two statistical analyses he performed to demonstrate that Defendants' actions in this case have resulted in a disparate impact on Asian households within Oak Hammock.

It is well-established that evidence which would be inadmissible at trial "cannot be used to avoid summary judgment." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007). Therefore, although evidence need not be in admissible form when submitted in opposition to a motion for summary judgment, a district court must find that the evidence could be reduced to admissible form at trial in order to consider it. *See Rowell*

4

*v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). To that end, all statements made by a witness at trial must be based on the witness's personal knowledge. Fed. R. Evid. 602. Further, evidence that involves the application of scientific or technical knowledge must be introduced through a qualified expert. *See* Fed. R. Evid. 701–702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993).

Harvick's first statistical analysis consists of identifying the national origin of every household within Oak Hammock and comparing the proportions of Asian households sued by Oak Hammock to the proportion of non-Asian households. Harvick explained at his deposition that he determined the national origin of each household in his analysis by looking at a master list of all homeowners governed by Oak Hammock, which was provided to him by Oak Hammock's management company, and then performing an Internet search of each homeowner's surname. (Doc. 48-3, 51:21–53:11). According to Harvick, his Internet research revealed that twenty-two of the surnames on the list "were of an Asian derivative."[2] (*Id.* at 52:3–7). Based on the number of lawsuits filed by Oak Hammock against homeowners with Asian surnames, Harvick concludes that Oak Hammock's litigation decisions disparately impacted Asian households. (Doc. 44, p. 8).

Harvick's second statistical analysis consists of applying the twenty-two Asian surnames identified in his first analysis to a database of documents provided by Oak Hammock's management company. (Doc. 48-3, 53:16–54:23). Harvick states that he

---

[2] Harvick has produced a spreadsheet memorializing his Internet research. (Doc. 44-2). The Court notes that this spreadsheet is difficult to interpret, as Harvick changes his national origin categories midway through the document and many of his tallies fall between category headings, making it impossible to verify whether the number of Asian households he identifies is twenty-two.

searched these documents for the twenty-two surnames and their corresponding addresses using a computer program he created, and that he uncovered forty-eight emails concerning violations of Oak Hammock's covenants.[3] (*Id.*). Harvick essentially claims that this number is statistically disproportionate when compared to emails regarding non-Asian household violations. (Doc. 44, pp. 16–17).

The Court finds that both statistical analyses and the Internet research forming their basis are inadmissible because Harvick lacks personal knowledge of the facts underlying them. Harvick admitted at his deposition that he never contacted anyone in any of the twenty-two households to confirm whether they were, in fact, of Asian descent. (Doc. 48-3, 49:20–50:6, 53:12–15). Indeed, Harvick has no idea outside of what he found on the Internet whether any of these twenty-two households are Asian.

Moreover, Harvick would not be able to introduce either statistical analysis at trial because the scientific methods and principles he employs are not sufficiently reliable. Pursuant to Federal Rule of Evidence 702, only expert witnesses are permitted to testify on topics that require the application of scientific or technical knowledge. In order to testify as an expert, the witness must satisfy three requirements: (1) he must be qualified by way of education, experience, training, or skill in the area he intends to testify, (2) he must employ reliable scientific methods and principles, and (3) the testimony he offers must assist the trier of fact to understand the evidence or to decide a factual dispute. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). As to the second requirement, courts consider a number of factors to determine whether an expert's methodology is

---

[3]   Harvick has also produced a document purportedly memorializing the results of the scan he conducted of Oak Hammock's emails. (Doc. 44-3, Ex. J).

sufficiently reliable, including whether the expert derives his data from reliable sources and whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of litigation.  *See Daubert*, 509 U.S. at 593–94; Fed. R. Evid. 702 advisory committee notes to 2000 amendments.

By way of sworn affidavit attached to his reply in support of his motion for summary judgment, Harvick attempts to qualify himself as an expert in the area of statistics in what appears to be an attempt to reduce his statistical analyses to admissible form.[4]  (Doc. 53, Ex. R).  Based on the education, experience, and skill Harvick describes in his affidavit, the Court finds that Harvick is qualified to conduct statistical analyses.  However, the methods and principles Harvick used to conduct the two analyses in this case fall far short of the reliability required of expert witnesses.  For the same reasons discussed previously, Harvick's exclusive reliance on uncorroborated Internet research leads the Court to conclude that he does not derive his data on homeowners' national origins from a reliable source.  Similarly, Harvick's failure to perform the relatively simple task of contacting homeowners to confirm the data yielded by his Internet research leads the Court to conclude that he did not exercise the same care a reasonable expert in statistics would have exercised in conducting professional work.

Because Harvick lacks personal knowledge of the facts underlying his statistical analyses and because he applies an unreliable methodology, Harvick's statistical evidence will be excluded from consideration on summary judgment.

---

[4]  The Court is unable to determine whether Harvick timely disclosed himself as an expert pursuant to Federal Rule of Civil Procedure 26, as no party has raised the issue or produced the relevant Rule 26 disclosure.  The Court assumes for the purposes of this Order only that Harvick's disclosure was timely.

**B.     Findings on Summary Judgment**

Turning to the parties' motions, Defendants move for summary judgment on the grounds that Harvick cannot establish a prima facie claim under either the FHA or the FFHA. Because "[t]he FHA and the [FFHA] are substantively identical, . . . the same legal analysis applies to each." *Bhogaita v. Altamonte Heights Condo Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014). The Court will therefore only reference the FHA in the following analysis, but will apply the law equally to Harvick's FFHA claim.

The purpose of the FHA is to end discriminatory practices in the provision of housing. *E.g.*, *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359 (6th Cir. 1995). Pertinent to this case, the FHA provides as follows:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA].

42 U.S.C. § 3617; *see also* 24 C.F.R. § 100.400(c)(2).[5] As part of stating a prima facie claim under § 3617, a plaintiff must establish that the defendant's actions were motivated in some way out of intentional discrimination toward the protected group to which plaintiff or his household belongs. *See Sofarelli v. Pinellas Cty.*, 931 F.2d 718, 722 (11th Cir. 1991). Discriminatory motive may be demonstrated by either direct or indirect evidence. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Direct evidence is evidence that proves discriminatory motive outright without the need to make inferences. *Id.* "[O]nly the most blatant remarks, whose intent could mean nothing other

---

[5] These same protections are afforded by the FFHA in § 760.37, Florida Statutes.

than to discriminate" constitute direct evidence. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). On the other hand, indirect evidence is circumstantial in nature and requires at least one inferential step to conclude that a discriminatory motive exists. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). For example, a common method for proving discriminatory motive through indirect evidence is to show that the defendant treated members of the plaintiff's protected group less favorably than non-members. *See id.*

In this case, Defendants show that their conduct was not motivated by discrimination toward persons of Asian descent. First, Defendants submit the sworn affidavit of Ayesha Antoine. (Doc. 48-5). Ms. Antoine is employed by Leland Management, Inc. ("Leland"), a company which provides management services to Oak Hammock.[6] (*Id.* ¶ 3, 4.1).[7] Ms. Antoine specifically works within Leland as Oak Hammock's Licensed Community Association Manager, where she assists Oak Hammock in enforcing its covenants, conditions, and restrictions, including conducting regular bi-monthly inspections of Oak Hammock's properties. (*Id.* ¶¶ 5.1, 5.2, 6). Ms. Antoine explains that when Oak Hammock's covenants, conditions, or restrictions are violated by a homeowner, Leland will send a notice to the homeowner on behalf of Oak Hammock directing that the violation be remedied. (*Id.* ¶ 7). Ms. Antoine represents that, per Oak Hammock's instructions, Leland affords a homeowner multiple opportunities to correct a violation before further action is taken. (*Id.* ¶ 10). However, after a prolonged

---

[6] Neither Ms. Antoine nor Leland are parties to this lawsuit.
[7] Ms. Antoine's affidavit contains two paragraph 4s and two paragraph 5s. The Court differentiates the pairs as 4.1, 4.2, 5.1, and 5.2, in that order.

failure to fix a violation, Leland will refer the homeowner's property to Oak Hammock's legal counsel. (*Id.* ¶ 11). Ms. Antoine confirms that Leland was never instructed by Oak Hammock to either target Harvick or other homeowners based on race, ethnicity, or national origin. (*Id.* ¶¶ 12–14).

Next, Defendants submit the sworn affidavit of Patrick Burton. (Doc. 48-8). The law firm Mr. Burton works for has served as Oak Hammock's general counsel for over eight years.[8] (*Id.* ¶ 5). Mr. Burton states that from May 2012 to November 2014, twenty-two properties were referred to his office by Leland for purposes of enforcing Oak Hammock's covenants, conditions, and restrictions. (*Id.* ¶¶ 7–8). Of these twenty-two properties, Oak Hammock filed suit against ten. (*Id.* ¶ 10). Mr. Burton also attests that his firm has never considered or been instructed by Oak Hammock to consider race, ethnicity, or national origin in pursuing legal action on behalf of Oak Hammock. (*Id.* ¶¶ 11–12).

Finally, Defendants submit the sworn affidavits of Rubin and Varasdi. (Docs. 48-6, 48-7). Rubin has served as a member of Oak Hammock's board of directors for over nine years where he assists Oak Hammock in enforcing its covenants, conditions, and restrictions. (Doc. 48-6, ¶ 4–5). Rubin estimates that between January 1, 2011 and July 17, 2015, approximately 322 of the 347 properties governed by Oak Hammock had been cited for a covenant violation.[9] (*Id.* ¶ 9). Rubin states that whenever Oak Hammock's legal counsel decides to sue a homeowner for a violation, he is asked to take

---

[8] Neither Mr. Burton nor his law firm are parties to this lawsuit.
[9] Rubin's estimate is corroborated by Leland's records, which indicate that Oak Hammock notified 328 unique addresses of at least one violation during the relevant time period. (Doc. 48-5, Ex. 1).

updated photographs of the subject property for use in litigation.  (*Id.* ¶ 22).  Rubin confirms that he was asked by Oak Hammock's legal counsel to take photographs of Harvick's property when it was decided that litigation would be initiated against him.  (*Id.* ¶ 25).  Varasdi also served on Oak Hammock's board of directors during the relevant time period.  (Doc. 48-7, ¶ 4).  Varasdi states that the sole purpose of the litigation that Oak Hammock instituted against the Harvicks was to enforce Oak Hammock's covenants, conditions, and restrictions.  (*Id.* ¶ 16).  Both Rubin and Varasdi aver that they have never considered the race, ethnicity, or nationality of any homeowner in enforcing Oak Hammock's covenants, including those of Harvick's family.  (*Id.* ¶¶ 10–12; Doc. 48-6, ¶¶ 18–21).  Rubin and Varasdi further affirm that they have never heard the race, ethnicity, or national origin of Harvick's household mentioned by any of Oak Hammock's board members.  (Doc. 48-6, ¶ 32; Doc. 48-7, ¶ 18).

Based on the sworn representations of Ms. Antoine, Mr. Burton, Rubin, and Varasdi, Defendants carry their initial burden of showing no genuine dispute that their actions were not motivated by discrimination against Asian Americans.  The burden therefore shifts to Harvick to produce affirmative evidence which would allow a rational trier of fact to conclude that Defendants harbored an intent to discriminate against Asian households.  *Celotex*, 477 U.S. at 325.

In his summary judgment briefing, Harvick does not contend that there is direct evidence of Defendants' discriminatory motive.  Indeed, Harvick indicated at his deposition that he had never heard Rubin or Varasdi speak negatively about people of Asian descent and that he had never been told by any person that his family was being targeted because of their Asian background.  (Doc. 48-3, 48:7–23, 50:20–51:8).  Rather,

Harvick seeks to prove Defendants' discriminatory motive through indirect evidence. To that end, Harvick relies primarily on the statistical analyses and underlying data discussed in Section III.A, *supra*; however, because the Court has determined that these analyses are inadmissible on summary judgment, Harvick cannot use them to demonstrate a genuine dispute of material fact.

Aside from the inadmissible statistical analyses and determinations of household national origins, Harvick raises two other arguments. First, Harvick contends that Rubin acted outside his authority as president of Oak Hammock's board of directors when he photographed Harvick's property and aided Oak Hammock's counsel in deciding which homeowners to sue. (Doc. 44, pp. 9–11; Doc. 52, pp. 7–8; Doc. 53, p. 12). In support, Harvick points to Oak Hammock's bylaws, which enumerate the powers conferred to the president of Oak Hammock's board of directors. (Doc. 53, Ex. Q). Harvick observes that nowhere in the bylaws is the president authorized to aid Oak Hammock in pursuing litigation against homeowners. (Doc. 44, pp. 9–11, 17; Doc. 53, pp. 3, 6). Presumably, it is Harvick's position that Rubin's unauthorized activities while acting as president evince a discriminatory motive.

Even assuming that Rubin acted outside the powers granted to him by Oak Hammock's bylaws, which the Court does not decide, Harvick produces no affirmative evidence that would allow a rational trier of fact to infer that Rubin's conduct was motivated by discrimination against Asian households. While Harvick believes that Rubin is lying when he states that Oak Hammock's legal counsel asked him to photograph properties, Harvick does not provide any evidence to substantiate his belief. To the contrary, Harvick conceded at his deposition that he only knew that Rubin photographed

properties that were the subjects of lawsuits filed by Oak Hammock. (Doc. 48-3, 39:11–40:14). Harvick ultimately fails to connect Rubin's conduct to his household's Asian background.

Second, Harvick asserts that Varasdi should be held liable under § 3617 because she failed to prevent the discriminatory conduct of others, including Rubin. (Doc. 53, p. 11). Harvick contends that Varasdi owed a fiduciary duty to homeowners to protect against discrimination by Oak Hammock. (*Id.*). While the federal courts that have considered § 3617 have predominantly held that liability can only be imposed for intentional, affirmative acts of discrimination, at least one court has left open the possibility that liability could lie for a defendant's failure to act where the defendant owed a special duty to the plaintiff. *See Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1144–45 (S.D. Fla. 2004). Assuming that Varasdi owed a fiduciary duty to Harvick and that such a fiduciary duty is sufficient to impose liability under § 3617 for a defendant's failure to act, which the Court again does not decide, Harvick produces no affirmative evidence that would allow a rational trier of fact to infer that Varasdi's inaction was motivated by discrimination against Asian Americans. Harvick conceded at his deposition that he had no evidence pointing to Varasdi viewing Asians negatively. (*See* Doc. 48-3, 48:19–23). Like Rubin, Harvick does not link Varasdi's inaction to his family's Asian background.

As a result, Harvick fails to genuinely dispute that the Defendants did not act with a discriminatory motive. Harvick therefore cannot establish a prima facie claim under § 3617 and summary judgment must be granted in Defendants' favor.

IV. **CONCLUSION**

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Final Summary Judgment (Doc. 48) is **GRANTED**.
2. Plaintiff, Ray Harvick's Motion for Summary Judgment (Doc. 44) is **DENIED**.
3. The Clerk of Court is **DIRECTED** to enter the judgment of the Court that Plaintiff, Ray Harvick, shall take nothing from Defendants, Oak Hammock Preserve Community Owners Association, Inc., Barry Rubin, and Karen Varasdi.
4. The Clerk of Court is further **DIRECTED** to terminate all pending motions and to close the file.

**DONE AND ORDERED** in Orlando, Florida on January 29, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
*Pro se* Plaintiff

14